## MIDLAND SAVINGS & LOAN CO. v. TRADESMEN'S NAT. BANK OF OKLAHOMA CITY, OKL.

### No. 441.

Circuit Court of Appeals, Tenth Circuit.

March 8, 1932.

Rehearing Denied May 4, 1932.

LEWIS, Circuit Judge, dissenting.

Jno. D. Rogers, of Denver, Colo. (J. H. Everest and J. B. Dudley, both of Oklahoma City, Okl., on the brief), for appellant.

Claude Nowlin, of Oklahoma City, Okl. (J. R. Spielman and M. M. Thomas, both of Oklahoma City, Okl., and John J. King, on the brief), for appellee.

Before LEWIS and McDERMOTT, Circuit Judges, and SYMES, District Judge.

SYMES, District Judge.

The Midland Savings & Loan Company, plaintiff appellant, hereafter called the plaintiff, is a Colorado building and loan association with headquarters in Denver, and was at all times mentioned making loans secured by real estate in Arkansas, Oklahoma, and elsewhere. The Tradesmen's National Bank of Oklahoma City, Okl., defendant appellee, hereafter referred to as the defendant, was a national bank, with its principal place of business at Oklahoma City, Okl. The plaintiff company was a customer and depositor of the defendant bank.

One Dan Dewberry had been the designated agent of the plaintiff for Arkansas, with offices at Texarkana, Ark., a border city, partly in Texas and partly in Arkansas, and was authorized to solicit and close loans for the Midland Company, taking his commissions from the borrowers, collected payments due on loans, and remitted to his principal in the regular course of business. About the 1st of April, 1927, Dewberry disappeared. An investigation disclosed that he had been unfaithful; that numerous checks sent him by the plaintiff company, payable to himself and various borrowers jointly, had been cashed without being indorsed by the borrowers.

It is established by litigation in the state court that each of the 19 checks which formed the basis of the 19 separate causes of action set out in the amended petition were in each instance drawn by the plaintiff on the defendant bank, to the order of the respective borrowers—in some instances two parties—and "Dan Dewberry, Agent," as joint payees; that the said checks had been forwarded to Dewberry by the Midland Company, with a letter of instructions in each case to close each particular loan in the manner set out therein.

It is also undisputed that Dewberry forged the indorsements of the payees on each check, other than himself, indorsed his own name, "Dan Dewberry, Agent" thereon, and deposited them to his own credit in an account in another bank, the Texarkana National Bank, designated "Dan Dewberry, Agent;" and that this had been his custom during his connection with the plaintiff company.

Dewberry was likewise loan agent for another company known as the Home Savings & Loan Association of Ft. Smith, Ark., and handled their business in a similar manner. Whenever Dewberry received, or purported to have received, an application for a loan, he would forward a written form application to the plaintiff company in Denver, together with an abstract, or purported abstract of title, to the property offered as security for the loan. The abstract would then be examined by the plaintiff company, together with whatever report was made as to the desirability of the loan, and, in each of the 19 transactions made the basis of this suit, the Midland Company would prepare a bond and mortgage covering the security offered, and forward the same, together with a check made out as above to Dewberry. The written instructions that went with each set of loan papers stated "in closing this loan, you act as our agent," followed by other directions as are customary in such transactions, varied in some details to suit each particular case. The plaintiff seeks to recover from the defendant bank the amount of these checks so paid by defendant and charged to its account.

The first cause of action of the amended petition was dismissed without prejudice, and the case went to trial on the other 18.

The second cause of action—typical of all —is as follows: "That on the 11th day of August, 1926, this plaintiff drew its check in writing, of said date, whereby it ordered and directed the defendant to pay to the order of R. M. Pinchin and Bonnie Bessie Pinchin, and Dan Dewberry, agent, the sum of Twenty-five Hundred Dollars ($2,500.00); said check was numbered 14603, and was presented for payment to the Tradesmen's National Bank on the 15th day of August, 1926, and the plaintiff then and there having money on deposit to the credit of this plaintiff in said bank, sufficient to pay said check, the same

was paid by the defendant and charged to the account of this plaintiff, and the amount of said check deducted from the amount this plaintiff then and there had on deposit."

"That there was endorsed on the back of said check the following names: 'R. M. Pinchin, Bonnie Bessie Pinchin', and 'Dan Dewberry, agt.'; that the signatures of the said R. M. Pinchin and Bonnie Bessie Pinchin, were forged thereon, and were not the true and genuine signatures of the said R. M. Pinchin and Bonnie Bessie Pinchin, or either of them, but their names were fraudulently signed to said check by some person unknown to this plaintiff; that neither the plaintiff, the said R. M. Pinchin nor the said Bonnie Bessie Pinchin, gave any authority to any person to sign their names thereto."

Plaintiff further alleged that there was no general contract of agency between the plaintiff and Dewberry.

The remaining causes of action, from the third to the nineteenth, inclusive, are substantially identical with the above, except as to the dates, names of payees, and the amounts of said checks. It was further alleged that each of the checks was presented to, and paid by, the defendant bank, after they had been paid by the Texarkana National Bank, and that the indorsement of the latter, together with that of the Federal Reserve Bank of Oklahoma City, guaranteeing prior indorsements, were on the checks when they were presented to, and paid by, the defendant bank.

The answer of the defendant consisted, first, of a general denial; then the allegation that Dewberry was the agent and representative of the Midland Company in Arkansas and Texas, was authorized to handle its loan business in that vicinity, to complete loans, disburse funds in making, completing, and protecting loans made by it; that at the times mentioned, and for a long time prior, it was the custom of Dewberry, as agent and representative aforesaid, to carry in the Texarkana National Bank of Texarkana, Tex., an account for and in behalf of the appellant, in the name of "Dan Dewberry, Agent"; that the instructions sent Dewberry for closing each of the loans contained the following language: "In closing this loan, you act as our agent." Also that Dewberry should not pay out any money to the borrowers from the proceeds of the checks until he had paid all taxes, obtained receipts, paid off liens, secured necessary releases, had all papers recorded, and the abstract brought down to date, showing the Midland Company's mortgage to be a first lien on the property in question.

It is then alleged that it was the custom and intent of the Midland Company in drawing the checks as aforesaid to make Dewberry its agent, to hold and cash the checks as its agent, and to deposit the proceeds as agent in his agency account in the Texarkana National Bank in Texarkana, Tex.; so that he could carry out their instructions in closing the loan, "all of which was known to the Texarkana National Bank to be the system of appellant, and under which circumstances the Texarkana National Bank was induced to pay checks * * * aforesaid."

It is further alleged in the answer that the proceeds of each check were paid to and received by the person intended to receive, hold, and disburse the same, to wit, "Dan Dewberry, Agent," for the plaintiff company, because of which plaintiff is not entitled to recover; that, by reason of the above facts, the plaintiff company represented to all persons dealing with Dewberry that he was its agent, with authority to indorse the checks, collect the money, and apply the proceeds in accordance with his instructions, and that the indorsees of each check, other than the payees named, accepted each check on the face of such representations, and but for such representations would not have accepted the same without making inquiries as to the genuineness or necessity of the signature of each payee; that, by reason of holding out Dewberry as agent, and by such representations, plaintiff company is now estopped to assert any indebtedness of the bank to it in any amount upon any of the several causes of action.

It is also a fact that some of the bonds and mortgages purported to have been signed by the borrowers were forged, and that some of the prior incumbrances on the properties on which the Midland Company loans had been placed had not been paid off, and that false certificates from abstracters had been put out.

The parties are in substantial agreement on the facts as set forth above, as distinguished from the legal conclusions pleaded. The plaintiff company, upon being apprized that signatures of the borrowers—the mortgagees—had been forged on the checks, notified the bank of the facts, and that it could proceed to protect itself against loss on account of these forged instruments.

Many of the borrowers sued the Midland Company in the chancery court of Miller county, Ark. where their properties were situated, to get relief from the mortgages of record, alleging they had not signed them;

others who had signed mortgages alleged they had not received the money, and in some cases on the ground that prior mortgages had not been paid and released. Each of these suits involved a different set of facts, but were all of the same general character.

The Midland Company appeared in these suits as a defendant, asserted the validity of their mortgages, and sought to foreclose. The borrowers, however, obtained the relief prayed for, and the mortgages were canceled, except that in a few cases they were held liable for money they had actually received on account of their loans.

Thereafter this action came on for trial before the court below and a jury. At the end of all the evidence, a motion for a directed verdict in favor of the defendant was granted on the grounds: First, that by defending in the state court there had been an election of remedies by plaintiff, the court sustaining the defendant's contention that this suit was brought upon the theory that the money of the plaintiff represented by the checks was still in the defendant's bank, while in the suits in the state courts, growing out of the same transactions, the plaintiff here had defended on the theory that the money had lawfully been paid by the bank on the forged checks, and had passed to the borrowers; that thereby the Midland Company made an election of remedies, and was estopped to bring this action. Secondly, the lower court further found, in granting the motion, that the loss of the Midland Company did not result from the payment of the forged checks by the defendant bank, but that the proximate cause of the loss was the defalcation of Dan Dewberry as its agent; that, by the course of conduct and its instructions to him, the plaintiff clearly intended that the money sued on was intended to, and actually did, reach Dewberry, plaintiff's agent, and was distributed by him as intended; that therefore it made no difference whether the borrowers' indorsements on the several checks were false or genuine.

The correctness of this ruling is the question raised by this appeal.

This detailed statement of fact is necessary to an understanding of the pertinent law of negotiable instruments.

▇ The relation of a bank and its depositors is stated in Leather Manufacturers' Bank v. Merchants' Bank, 128 U. S. 26 at page 34, 9 S. Ct. 3, 4, 32 L. Ed. 342, as follows: "Its obligation to the depositor is only to pay out an equal amount upon his demand or order;

and proof of refusal or neglect to pay upon such demand or order is necessary to sustain an action by the depositor against the bank. The bank cannot discharge its liability to account with the depositor to the extent of the deposit, except by payment to him, or to the holder of a written order from him, usually in the form of a check. If the bank pays out money to the holder of a check upon which the name of the depositor, or of a payee or indorsee, is forged, it is simply no payment as between the bank and the depositor; and the legal state of the account between them, and the legal liability of the bank to him, remain just as if the pretended payment had not been made." See, also, United States v. National Bank of Commerce (C. C. A.) 205 F. 433.

The next issue of law raised by the record is how far the parties had the right to rely upon Dewberry's acts as plaintiff's agent. On this phase of the case it may be said that a well-defined exception exists in respect to negotiable instruments, it being generally held that an undisclosed principal is not liable upon a bill or note drawn, accepted, signed, or indorsed by the agent in his own name, although the agent was acting in the course of his employment, and within the scope of his authority. 2 C. J. 843, § 525. See, also, 7 Cyc. 549.

The power of an agent to execute or indorse commercial paper is strictly limited, and will never be "lightly inferred," but must be conferred expressly, 2 C. J. 636, § 280, and cannot be based upon prior, customary acts, where it does not appear that the indorsee ever knew of any instance of the payee having ratified an unauthorized indorsement by such agent. 2 C. J. 636, note 21d, Utah Banking Co. v. Newman, 44 Utah, 194, 138 P. 1146, and "the courts are even more insistent that one dealing with an agent shall inquire whether he has sufficient authority, when such agent assumes to make or endorse negotiable paper." 2 C. J. 564, and cases cited.

To same effect is Strawn Farmers' Elevator Company v. James E. Bennett & Co., 168 Ill. App. 428. And power to deal in a certain way with commercial paper is not to be enlarged by construction to permit the doing of other, although somewhat similar, things. 2 C. J. 640, § 283; Fay v. Slaughter, 194 Ill. 157, 62 N. E. 592, 56 L. R. A. 564, 88 Am. St. Rep. 148.

So, also, authority to use paper with one person or one bank implies no authority to deal with another person or another bank. 2 C. J. 640, § 283; Clement v. Dickey, 5 Fed.

Cas. No. 2883; Sims, Ex'r, v. U. S. Trust Co., 103 N. Y. 472, 9 N. E. 605.

Mechem on Agency says (section 969) that authority to make or indorse negotiable paper is not ordinarily to be included within the terms of general grants, and "the rule is abundantly established that it can exist only when it has been directly conferred, or is warranted by necessary implication."

Section 971: "Authority to bind the principal by negotiable paper will only be implied where it is practically indispensable to accomplish the object." See, also, section 977.

Section 998 states: "As many businesses may be, and constantly are, conducted without the exercise of this extraordinary power, the mere fact that one is authorized to manage a business, does not of itself alone imply that he may bind his principal by making, accepting or endorsing negotiable paper."

So in the case at bar it was not indispensable to the proper conduct of appellant's business by Dewberry that he indorse these checks. Manifestly such authority had never been expressly granted. The most that defendant claims is that it necessarily followed, as an incident of the agency created by the letter of instructions that went to Dewberry with each loan. But, as appellee's counsel state in their brief: "The bank, of course, never saw the letters until after this suit was filed."

So it cannot be said that they were misled, or acted to their detriment in reliance upon the letters of instructions. These letters, it is true, made Dewberry the general agent of the company in closing these loans, but specifically state he will not indorse the draft—that is, the check—or pay out any money until the abstract shows that the proposed loan of the Midland was a first lien.

And, what is more important, we have the express notice given by the checks that the proceeds were intended for others besides Dewberry, and that the borrowers' indorsements were required before they could lawfully be cashed.

The record discloses that, although Dewberry had been forging these indorsements over a considerable period of time, yet plaintiff and both banks were alike ignorant of the forgeries until Dewberry's flight, so manifestly there could have been no ratification.

 The payees of these checks were various residents of Arkansas, and strangers to the plaintiff located in Denver. Plaintiff, as drawer, had the right to assume the checks bore the genuine indorsements of the payees when paid, and charged to its account by the defendant. The rule is very well settled that, in the absence of special circumstances, the depositor is not required to know the signature of the payees that he names in his checks. Leather Manufacturers' Bank v. Morgan, 117 U. S. at page 107, 6 S. Ct. 657, 660, 29 L. Ed. 811, holds that, while the depositor is required to examine his pass book and vouchers when returned by the bank, and, if there appear to be any errors or omissions, to notify the bank, he is not bound to discover at his peril forgeries of the payee's name, because, as the court says: "The drawer was not presumed to know the signature of the payee; his examination of the account would not necessarily have disclosed the forgery of the payee's name; therefore his failure to discover that fact sooner than he did was not to be attributed to want of care."

And 7 C. J. 687, § 415, says: "The duty of the depositor does not, however, extend to the examination of endorsements on his checks, as he is justified in relying upon the bank's observing proper precautions to see that payment is made only in accordance with his directions and he is not bound to know the signatures of the payee or other as endorsers;"

A good statement of the same rule is found in Shipman v. Bank of New York, 126 N. Y. 318, 27 N. E. 371, 12 L. R. A. 791, 22 Am. St. Rep. 821—a much-quoted case—holding the bank liable to its depositor for money it paid out on checks drawn by its depositor, the indorsements of which were forged; the bank having paid the checks without inquiry as to the genuineness of the indorsements, and that the bank was not relieved from liability, even though the checks were returned to the depositor with his pass book, and received without objection, in the absence of a showing of negligence on the part of the depositor. In the very late case of National, Surety Company v. President and Directors of the Manhattan Company, 252 N. Y. 247, 169 N. E. 372, 67 A. L. R. 1113, the Court of Appeals of New York went even further and held the depositor was under no duty to examine indorsements on checks in order to discover whether signatures indorsed were genuine, and failure to do so was not negligence.

In Cosmopolitan State Bank v. Lake Shore Trust & Savings Bank, Supreme Court of Illinois (1931) 343 Ill. 347, 175 N. E. 583, the court follows this rule, stating the depositor has no greater knowledge of the genuineness of the signature of the payee than the bank. And in Atwell v. Mercantile Trust Company of California, 95 Cal.

App. 338, 272 P. 799, 801, the Shipman Case, supra, is cited, the court saying: "But a depositor is not bound to examine the endorsements on returned checks. * * * The drawer is not presumed to know, and in fact seldom does know, the signature of the payee. The bank must, at its own peril, determine that question."

In First National Bank v. Whitman, 94 U. S. 343, 347, 24 L. Ed. 229, it is said: "The bank supposed that it had paid the check; but this was an error. The money it paid was upon a pretended and not a real indorsement of the name of the payee. The real indorsement of the payee was as necessary to a valid payment as the real signature of the drawer; and in law the check remains unpaid. Its pretended payment did not diminish the funds of the drawer in the bank. * * * " See, also, United States v. National Bank of Commerce (C. C. A.) 205 F. 433. The rule seems to be universal and obtains in Oklahoma. State Guaranty Bank v. Doerfler, 99 Okl. 258, 226 P. 1054.

■ Counsel for defendant argue that the position of the defendant bank is the same as that of the Texarkana bank that cashed the checks. The Texarkana bank and the plaintiff company were strangers, and the relation of depositor did not exist between them as it did between the plaintiff and defendant. As shown, the defendant bank, upon presentation of these checks drawn by its depositor, was bound at its peril to pay only on a genuine indorsement. The answer alleges that neither bank made any investigation, and the record shows that defendant relied solely upon the indorsements of the Texarkana bank and the Federal Reserve Bank, from whom it received the checks for payment. Reasons that might have motivated the Texarkana bank to cash the checks for Dewberry were not necessarily available as a defense to the defendant against the plaintiff company. The care the law requires it to exercise, and its liability, cannot be affected thereby. It is quite apparent that, when it received the checks with forged indorsements guaranteed by the Texarkana bank and the Federal Reserve Bank, it chose to pay in reliance thereon—a very common practice among banks. Such was the exact situation in Jordan Marsh Company v. National Shawmut Bank, 201 Mass. 397, 87 N. E. 740, 22 L. R. A. (N. S.) 250, a well-considered case often cited with approval. After reiterating the rule, the court said (page 741 of 87 N. E.): "This rule of law applies as well to payments made by a banker through the clearing house as to payments made over the counter."

And that, if the bank on which the check is drawn chose to pay on a guarantee of the indorsements of the payee's name by another responsible bank, this does not affect the duty of the paying bank to its depositor. Page 741 of 87 N. E.: "It simply indicates a willingness of the bank to disregard and neglect the duty, upon the guaranty of a responsible party that the duty has already been perfectly performed for it by a preceding party from whom the check has been received."

Except in the case of partners, where negotiable paper is payable to two or more persons jointly, all must join to transfer the title; that one of several payees has no authority to indorse the name of his copayees (8 C. J. 340, § 516), and such is the provision of the Negotiable Instrument Law.

■ It is said that the money represented by these checks was in fact intended for Dewberry alone. Had the defendant had knowledge of the letter of instructions to Dewberry, it might be conceded that the record offers some support to this theory, but, except in instances later to be noted, there is no claim that the borrowers authorized Dewberry to indorse the checks for them, and the plaintiff, by making the borrowers joint payees, as well as Dewberry, gave direct notice to the contrary. The claim that the plaintiff authorized Dewberry to indorse the name of the borrowers is untenable for another reason: The plaintiff could not authorize him to indorse as agent for the borrowers.

Three very pertinent cases on this phase of the discussion are Los Angeles Investment Company v. Home Savings Bank, 180 Cal. 601, 182 P. 293, 5 A. L. R. 1193; United States Cold Storage Company v. Central Manufacturers District Bank, 343 Ill. 503, 175 N. E. 825, 74 A. L. R. 811, and Cosmopolitan State Bank v. L. S. T. & S. B., 343 Ill. 347, 175 N. E. 583. In the first the court deals with a very similar situation, created by the dishonesty of an employee of the drawer of the check, and, for reasons applicable here, held the company not bound by the fraudulent acts of its agent in forging indorsements on its checks; that the intent and knowledge of the principal was that the money should go to the party named as payee, and the court would not concern itself with an act done by the guilty agent, especially when adverse to the principal, and against the agent's interest to reveal.

A similar situation was presented in the United States Cold Storage Company Case, supra. We quote from the opinion (page 829 of 175 N. E.): "The negligence of the drawer of a check is immaterial, unless it is such as directly and proximately affects the conduct of the bank in the performance of its duties. [Citing cases.] A bank can justify a payment on a depositor's account only upon the actual direction of the depositor. The questions arising upon checks between the drawee and the drawer 'always relate to what the one has authorized the other to do. They are not questions of negligence or of liability of parties upon commercial paper, but are those of authority solely. * * * The question of negligence cannot arise unless the depositor has, in drawing his check, left blanks unfilled, or by some affirmative act of negligence has facilitated the commission of a fraud by those into whose hands the checks may come.' "

And in the Cosmopolitan Bank Case, supra, the court dealt with a defense identical with that urged here, in the following language (pages 584, 585 of 175 N. E.): "The relations of Anderson and Schuster, of Schuster and the automobile company, of the automobile company and Anderson, or of any of them, and the bank, under the circumstances shown by the evidence, had nothing to do with the duty of the bank to pay the check to the order of the automobile company. It was a complete stranger to the transaction of the purchase of the car and was under no obligation to any one in respect to that transaction. Its duty in regard to the check · was to Anderson only—the drawer. The general rule is well settled that the obligation of a bank is to pay, on demand, the funds of the depositor to the payee named in each check, or to his order or to bearer, as the check may direct, and it must ascertain at its peril the identity of the payee and the genuineness of the indorsements, though each indorsement is a guaranty of all prior indorsements. The bank cannot settle equities among the various indorsers, the payee and the drawer of a check and third parties, strangers to the instrument, but its only authority, where the check is payable to the order of the payee, is to pay it on such order according to its terms. Yet the defendant in error's brief is based entirely on these supposed facts wholly outside the terms of the check: (1) Anderson, the drawer, intended that Schuster should use the check or its proceeds to accomplish the payment of a particular automobile, and that

was done; (2) Schuster was authorized to use the check in the manner he did;" etc.

The decision in Federal Land Bank of Omaha v. Omaha Nat. Bank, 118 Neb. 489, 225 N. W. 471, is based on the exception to the general rule, as the court makes clear. It turned upon the peculiar provisions of the statutes applicable to federal land banks.

In Merchants' Nat. Bank v. Home Bldg. & Sav. Ass'n, 180 Ark. 464, 22 S.W.(2d) 15—stressed by appellee—different instructions were given Dewberry in the way the check was to be handled. Many other cases cited by appellee are not in point on the facts, and in many the question of forgery is not involved.

The so-called Arkansas rule has never been approved by the federal courts. The only federal case cited by appellee is United States v. National Exchange Bank (C. C.) 45 F. 163, an opinion by a District Judge. There, the bank which paid the check on a forged indorsement was held not liable to the drawer because the person who committed the forgery was, in fact, the person to whom the drawer delivered the check, and whom he believed to be the payee.

The suits in the state court do not bar this action.

 The second cause of action was not litigated there. In the other 17 the plaintiff here was made a defendant in all but the seventh and tenth. In those two the Midland Company was plaintiff. In some the owners of the respective properties, upon which the mortgages had been placed of record in favor of the Midland Company, sued to cancel the notes and mortgages. In others the holders of prior mortgages made the Midland · Company party defendant in order to establish their mortgages as prior and superior, and the two actions that the Midland Company brought—the seventh and tenth—were to establish the validity of its notes and mortgages. The issue was the same in all, however, to wit, the validity of the respective mortgages, notes, and checks, and the genuineness of the indorsements on the latter.

The state court determined as a fact that the indorsements were all forgeries; that the Midland Company had no remedy against the payees, or mortgagees, except in a few instances where, on equitable principles, it held for the Midland Company to the extent only of the amount that the borrower had actually received from Dewberry, for which it gave an equitable lien, at the same time

canceling its notes and mortgages. That litigation determined that the appellant in the case at bar had no right of action against the payees of the respective checks.

A party makes an election only between existing, not supposed or mistaken, rights, Bierce v. Hutchins, 205 U. S. 340, 27 S. Ct. 524, 51 L. Ed. 828; Thomas v. Sugarman, 218 U. S. 129, 30 S. Ct. 650, 54 L. Ed. 967, 29 L. R. A. (N. S.) 250; Doyle v. Hamilton Fish Corp. (C. C. A.) 234 F. 47, and cannot destroy its rights by following remedies which turn out not to exist. It therefore appears that at no time did the Midland Company have two remedies; that all it had was one against its banker for paying its checks on false indorsements.

The fact that it misconceived its remedy, or attempted to exercise a right to which it is not entitled, and was defeated, does not constitute an election, or preclude it from prosecuting an inconsistent, remedial right. A party is not held to have two remedies between which he must elect, where there is a valid defense to one of them. See, generally, 20 C. J. §§ 1 to 18, inclusive, pp. 2 to 18, inclusive.

The forgeries are admitted by both parties here, and it cannot be said that the Midland Company should at its peril have permitted the actions in the state court to go against it by default.

The question of whether the indorsements on the checks were forged or not had to be determined by some court before the rights of the parties could be finally determined. Neither was prejudiced by having that determined in advance, and the state court was competent to try that issue.

A very late case on this question is Henderson Tire & Rubber Co. v. Gregory et al. (C. C. A.) 16 F.(2d) 589, 593, 49 A. L. R. 1503, in which Judge Booth assembles the authorities, and holds that to constitute an election two actual inconsistent remedies must exist for one wrong, and that the pursuit of a supposed, but nonexistent, remedy, does not constitute an election, quoting Barnsdall v. Waltemeyer (C. C. A.) 142 F. 415, at page 420, as follows: "But the fatuous choice of a fancied remedy that never existed, and its futile pursuit until the court adjudges that it never had existence, is no defense to an action to enforce an actual remedy inconsistent with that first invoked through mistake."

▮ It appears, however, that as to certain of the checks the Midland Company pursued Dewberry either by making a claim against his estate or accepting relief as against Dewberry and his estate. If this was done subsequent to the time the plaintiff acquired actual knowledge, as distinguished from suspicion, that Dewberry had forged the indorsements, or if the relief asked for or accepted was grounded upon the fact of his forgery, then under the rule laid down, supra, it elected to treat the entire proceeds of such checks as lawfully coming into his possession, and thereby ratified the act of the bank in paying out its money. Since the case must be reversed, it is unnecessary to make a finding of fact on this question, for the evidence may develop differently at another trial. Furthermore, there is some evidence that as to two checks Dewberry was the actual borrower, and that the ostensible borrower was a "straw man," and known to be such by the plaintiff. If such is the fact, it may be sufficient to justify a jury in finding as to that particular transaction that Dewberry was actually authorized to indorse the "straw" borrower's signature to the check.

▮ Furthermore, defendant is entitled to credits for the amount of the liens granted by the state court, together with all sums recovered from the surety company on account of loans included in counts 2 to 19, inclusive.

The judgment of the lower court is reversed, and the case remanded for a new trial.

McDERMOTT, Circuit Judge.

I concur in the opinion of Judge SYMES; I reach the same conclusion by a somewhat different method of approach, and perhaps place my emphasis in a different place.

When these checks were presented for payment, the bank was advised that there were two payees—"Dan Dewberry, Agent," and the borrower. The Negotiable Instruments Law of Oklahoma provides: "Where an instrument is payable to the order of two or more payees or indorsees who are not partners, all must indorse, unless the one indorsing had authority to indorse for the others." C. O. S. 1921, § 7711.

The bank knew, therefore, that it had no right to pay these checks unless (a) the borrowers had indorsed them, or (b) the borrowers had authorized Dewberry to indorse for them. There is not even a claim that the borrowers (except the "straw" men referred to by Judge Symes) authorized Dew-

berry to indorse. The plaintiff could not, of course, authorize Dewberry to sign a borrower's name. The fact that the borrower was named as a payee was written, clear, and unequivocal notice to the bank that the plaintiff required the indorsement of the borrower before parting with its money. I therefore cannot see that the question of the scope of Dewberry's powers as agent has any bearing; even if he were president and general manager, the plaintiff would still have a right to make a check payable jointly to him and another; and, when it does, it is notice to the world that, as to that check, the signatures of both payees are required.

It seems to me that this is the ordinary case of a bank paying on a forged indorsement. Counsel for the bank frankly and fairly accepts the law to be that a bank, paying on a forged indorsement, is liable "unless such payment is properly attributable to the negligence or other fault of the depositor or unless the money has actually reached the person whom the drawer intended should receive it, or the drawer himself. 7 C. J. 686, par. 414." The case before us is whether the facts bring this case within these exceptions; and, if not, whether the plaintiff is barred, in whole or part, by an election of remedies.

1. The first line of defense is that the plaintiff intended the funds to reach Dewberry's exclusive control; that, even if the borrower had indorsed the checks, Dewberry would have come into exclusive control of the money, and would have embezzled it just the same; that therefore the forgery was but an incident of, and not the cause of, the loss. I think the defense is not well taken for two reasons.

(a) I do not believe that an intention of plaintiff that Dewberry should have exclusive control after the borrower indorses—which is the most that can be made of the evidence—will support a finding that plaintiff intended the funds to come into his control without the borrower's indorsement; if Dewberry came into exclusive control after the borrower indorsed, it could only be with the consent of the borrower; and certainly the legal relation of plaintiff and the borrower is not the same when his indorsement is genuine as when it is forged.

(b) I do not think the record discloses any basis for a finding that the plaintiff intended this money to come into the exclusive control of Dewberry after the genuine indorsement of the borrower—much less that the evidence is so conclusive that it should be taken from the jury. The best evidence on the question of plaintiff's intent is the checks. They are in writing, conceded, and unambiguous. By making the check payable jointly to Dewberry and the borrowers, I think the writing discloses a clear and unmistakable intent that the money should not reach the exclusive control of Dewberry, but should go to the joint control of Dewberry and the borrowers. Of course, the borrowers could, and many of them did, consent to Dewberry's exclusive control; but such control comes then from the consent of the borrower, and not from the intent or direction of plaintiff. If the borrower consents to exclusive control, and embezzlement follows, the plaintiff's rights against the borrower are vastly different from the case where the borrower does not indorse.

The reason checks are made payable to joint payees is to prevent any of the funds being used without consent of both. We cannot say that the plaintiff did not so intend. Defendant answers that it was impossible for Dewberry to comply with his instructions without such exclusive control; that he could not pay off taxes and prior liens without the use of the funds represented by the checks; that exclusive control was necessary, and the intent is implied from the necessity. But there is no such necessity, nor any evidence thereof. The distribution of the proceeds of a check payable to two or more payees can and is every day accomplished without either having exclusive control of the proceeds, either by checks of distribution being delivered simultaneously with the joint indorsement, or by placing the proceeds of the joint check in a joint account. We cannot hold, as a matter of law or of fact, that it is necessary that an agent have exclusive custody of the proceeds of a joint check, in order to close a loan. To so hold would be to challenge the right of lenders to make checks payable jointly to their agents and their borrowers, a well-settled practice in the business world.

The plaintiff intended just what the checks said, and just what is universally intended when checks are issued to joint payees—that none of the proceeds should be available until all had agreed on the distribution. I cannot agree with defendant that there is any evidence indicating a contrary intent. I agree that, where the proceeds of a check reach the person intended, no harm has been done; but I cannot agree that, when a drawer names two payees, he intends but one.

2. I find no evidence of negligence or estoppel. The claim rests upon the proposition that the plaintiff did business through an agent, and authorized him to pay off prior liens and close loans. If insurance companies or other lenders are to do business away from their home office, as they do, agents must be utilized. In making loans, taxes, prior liens, abstract and recording fees must often be paid from the proceeds. I can see no negligence in appointing an agent for the purpose, nor in making the check payable to him and the borrower. Certainly it is the customary method; and, by the use of joint checks, assurance is given that a proper distribution is made only with the consent of the borrower. Nor is there any evidence of estoppel; the plaintiff held Dewberry out as its agent, and he was. There was therefore no misrepresentation; nor was there evidence of any reliance by appellee on any misrepresentation. The Oklahoma statutes provide: "Where a signature is forged or made without authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party, against whom it is sought to enforce such right, is precluded from setting up the forgery or want of authority." C. O. S. 1921, § 7693.

I find no evidence supporting the conclusion that the plaintiff is "precluded from setting up the forgery or want of authority."

Some of the cases dealing with the liability of banks upon forged indorsements are: Crahe v. Mercantile Trust & Savings Bank, 295 Ill. 375, 129 N. E. 120, 12 A. L. R. 92, and note, page 211; Porges v. United States Mortg. & T. Co., 203 N. Y. 181, 96 N. E. 424; Brown v. People's National Bank, 170 Mich. 416, 136 N. W. 506, 40 L. R. A. (N. S.) 657; People v. Bank, 75 N. Y. 547; United Workmen v. Bank, 92 Kan. 876, 142 P. 974, L. R. A. 1915B, 815; Crawford v. West Side Bank, 100 N. Y. 50, 2 N. E. 881, 53 Am. Rep. 152; Second Nat. Bank v. Trust & S. D. Co., 206 Pa. 616, 56 A. 72.

LEWIS, Circuit Judge (dissenting).

Appellant, a Colorado corporation having its office at Denver, accepted eighteen applications (sent to it by Dan Dewberry) for loans on real estate at Texarkana, Arkansas. It sent by mail its bank check on appellee, located at Oklahoma City, Oklahoma, for the full amount of each loan to Dan Dewberry at Texarkana. He maintained an office there and was in the real estate and insurance business. The several dates of the checks and their remittance began August 11, 1926, and ended March 25, 1927. Each check named the borrower and "Dan Dewberry, Agent," as payees and was made payable to their order. Dewberry endorsed the name of the borrower on the back of each check, signed his name as agent thereunder and obtained credit for the full amount of each check with the Texarkana National Bank in an account carried in the name of "Dan Dewberry, Agent" in that bank. The Texarkana National Bank sent the checks through the usual channels to the appellee bank. It paid them on demand and charged them to the account of appellant, the drawer. Some of the borrowers received from Dewberry part of the amounts to be loaned to them, either directly or by payment and discharge of prior liens on their property. Dewberry had acted for appellant in this way in closing loans it made at Texarkana since early in 1923, but it denies that he was ever its agent. Soon after receiving the check of March 25, 1927, and taking credit for it in his agency account as stated, Dewberry absconded and no property belonging to him or held by him for others could be found.

Relying on the general rule that a bank pays its depositor's forged check or checks with forged endorsements thereon at its peril, appellant now seeks recovery of the amounts of these checks, after giving credit for the disbursements above referred to. Of course I accept that rule of law, but in my judgment it has no application to the facts of this case.

In response appellee contends that Dewberry was appellant's agent to close the loans represented by the eighteen checks, and that he was to disburse the money in each case in discharge of prior liens, in payment of taxes, in procurement of insurance, and to give the borrower only the remainder, if any; that these duties imposed on Dewberry as appellant's agent could not be discharged unless he had control of the funds, and that when the checks and their proceeds came into Dewberry's possession they were under Dewberry's control as appellant intended they should be as its agent; that Dewberry could not have discharged his duties to appellant as its agent in closing the loans without custody of the checks and their proceeds; that Dewberry in endorsing the names of the borrowers committed no actionable wrong

against appellant to its damage, and that the sole cause of the losses here sued for was embezzlement by Dewberry of his employer's money, for which appellee is not liable. This contention was sustained by the Supreme Court of Arkansas in litigation involving some of these loans to which appellant was a party. Midland Sav. & L. Co. v. Home Bldg. & Sav. Ass'n et al., 177 Ark. 236, 6 S.W.(2d) 5; Lavender v. Buhrman-Pharr Hdwe. Co. et al., 177 Ark. 656, 7 S.W.(2d) 755. In those cases it was held on facts like those here, which will be presently recited, that Dewberry was appellant's agent and that it must suffer the loss for his acts in embezzling the proceeds of the checks. In another case [Merchants' Nat. Bank v. Home Bldg. & Sav. Ass'n, 180 Ark. 464, 22 S.W.(2d) 15] where the material facts were like those here that court held that the bank on which the check was drawn was not liable to the drawer, although Dewberry had endorsed the name of the borrower as here. See, also, to the point Federal Land Bank of Omaha v. Omaha National Bank, 118 Neb. 489, 225 N. W. 471. It was held in the case last cited that the depository is not liable to the drawer of the check where one of the payees forged the name of his copayee as an endorser and received the fund, if the drawer intended that he should receive it. That appellant intended that the funds represented by these checks should come into the custody and control of Dewberry seems to me to be clear from the facts; and the purpose of that intention seems equally clear—that Dewberry as appellant's agent should so safeguard, distribute, and pay out the fund for each loan as to assure appellant a first lien. The additional and uncontradicted facts in support of the foregoing statements and conclusions are these. Appellant sent the checks to Dewberry, not to the borrowers. With each check it sent to Dewberry a printed letter of instructions, dated and addressed to him. After referring to the loan by a number given to it and the borrower by name, the instructions said:

"In closing this loan you act as our agent. * * *

"Have all papers signed and acknowledged by borrowers with their names and initials as above and as they appear in bodies of the instruments; and have at least two witnesses to signatures on both Mortgage Bond and Mortgage.

"When papers are properly signed, acknowledged and witnessed, mail to us the Mortgage Bond, Certificate of stock and Insurance Policies, fire and tornado for three or five years, with our mortgage clauses attached, for at least the amount of the loan. * * *

"You Will Not Endorse Draft and Pay Out Any Money Until Abstract Is Continued, and in Your Possession, Showing Our Mortgage a First Lien and All Taxes Paid and Insurance Written.

"You get abstract from abstractor yourself and mail it to us. If the abstract, when continued, should show any unreleased mortgages, mechanics' liens, judgments or suits pending affecting the property, or any other entries of any kind, you must see that they are all cleared up, in addition to liens and transfers mentioned in Special Instructions (if any) and you must know of your own knowledge, after personally examining abstract, that our mortgage is a first lien before turning over any of the money. If necessary, write us for instructions, sending abstract back for inspection. Do Not Take Any Chances in turning over money if there is any doubt in your mind as to title and our mortgage being a first lien.

"Do not send in insurance policies to any mutual companies or in any new or local companies. If borrowers have old insurance that runs a less time, get those policies cancelled and Send In New policies. In all residence loans insurance must run for three or five years.

"You must see that all insurance premiums are paid out of draft. * * *

"Waiver must be signed and acknowledged according to printed instructions thereon, whether there are any bills paid out of the loan or not. It must be signed by all labor and material men. After each signature (for) material, designate what they furnish.

"Contractor should sign the waiver for balance due him, but his signature is not sufficient to cover labor and material bills.

"When you are sure that our mortgage is a first lien and all bills paid, if any, Insurance Written, Taxes, Insurance Premiums and Loan Expenses Paid, then pay out the funds as instructed herein and return abstract and all other papers that have not already been sent in. * * * *"

I think the conclusion of the trial judge that Dewberry received the money on these checks as appellant's agent, as it intended he should, was established by the uncontradicted evidence. What else could appellant

have meant in this letter of instructions when it said: "In closing this loan you act as our agent. You will not endorse draft and pay out any money until etc. * * * and you must know of your knowledge, after personally examining abstract, that our mortgage is a first lien before turning over any of the money. Do not take any chances in turning over money if there is any doubt in your mind as to title and our mortgage being a first lien. You must see that all insurance premiums are paid out of draft." Moreover, a fidelity insurance policy in the sum of $4,000 had been issued for the protection of appellant against Dewberry's dishonesty as appellant's employee, and in its claim for the $4,000, which was paid by the surety company, appellant stated that the losses to appellant were because of the failure of Dewberry to clear titles to property on which appellant made loans and for which it had sent checks for the full amount of each loan to him—an admission that it was Dewberry's duty as appellant's employee to disburse the amount of each loan for the protection of appellant.

The learned District Judge was of the opinion, and so stated to the jury at the close of the evidence, that by the course of conduct of appellant and its instructions to Dewberry the money represented by the checks was intended to and did reach Dewberry, who was plaintiff's agent; that appellant intended that it should reach him and be disbursed by him, and that his defalcation as agent was the proximate cause of the loss, and that no loss resulted to appellant as the result of the payment of the checks by appellee because the borrower's name had been endorsed thereon; and by reason of said conclusion, with which I agree, the court, in my judgment, did not err in directing a verdict in favor of appellee. I therefore think the judgment should be affirmed.

On Petition for Rehearing.

PER CURIAM.

The appellee requests that the opinion be clarified with respect to election of remedies, and that this court affirm the judgment as to those checks where the evidence disclosed an election under the principles of law announced in the opinion. It is argued that the evidence offered is in writing, and that there is no occasion for the needless expense of a new trial. But we are without power, in an action at law, to direct a judgment. Slocum v. New York Life Ins. Co., 228 U. S. 364, 33 S. Ct. 523, 57 L. Ed. 879. The judg-

ment entered in this case is a single judgment, and our power to sort out the checks where there was evidence of an election of remedies on the record of the last trial, and affirm the judgment as to those checks, is at least doubtful. While the order is for a new trial, it does not follow that the expense of a new trial need be incurred. Where the evidence is in writing or undisputed, and where counsel involved are lawyers of standing, it is seldom that the litigants are put to the expense of another trial.

Counsel assert their doubt as to the principles of election of remedies set out in the opinion. The last sentence of the opinion, concerning credits, may be responsible for counsel's doubt, although elsewhere in the petition for rehearing, counsel demonstrate their clear understanding of the rule announced. The opinion stated: "If the relief asked for or accepted was grounded upon the fact of his forgery, then under the rule laid down, supra, it elected to treat the entire proceeds of such checks as lawfully coming into his possession, and thereby ratified the act of the bank in paying out its money."

It is questionable whether an attempt at amplification will clarify or confuse. The underlying principle is this: There was no election where the appellant pursued a borrower, even to judgment, on the assumption that the indorsement was genuine. On the assumption that the indorsement was forged, the appellant had one of two remedies, but not both. It could elect to treat the payment by appellee as unauthorized; that is, that its money was still in the bank. Or it could elect to treat the payment by appellee as authorized, notwithstanding the forged indorsement, and proceed on the assumption that its money was no longer in the bank, but had passed to Dewberry or to a borrower. If it does the latter, it has no claim against the bank as to that check. If appellant either asked for, or accepted, relief against Dewberry, a borrower, a bondsman, or any one else, grounded upon the fact that the proceeds of the check, notwithstanding the forgery, had passed out of the bank, it cannot thereafter look to the bank for payment of that check or any part thereof. Each check is an entirety; it was either rightfully or wrongfully paid. A check cannot be split. Jones v. First Nat. Bank, 3 Neb. Unof. 73, 90 N. W. 912; Shonkweiler v. Harrington, 102 Neb. 710, 169 N. W. 258; Crook v. First Nat. Bank, 83 Wis. 31, 52 N. W. 1131, 35 Am. St. Rep. 17; Sunderlin v. Warner, 42 Idaho, 479, 246 P. 1. The statement as

to credits, in the original opinion, must be construed in the light of this principle; and if the facts develop that all the credits are for parts of entire checks as to which there is no liability, then there will be no credits to be made.

The petition for rehearing urges a new theory to sustain the judgment, bottomed upon the accepted proposition that an indorser warrants the title of a negotiable instrument. It is urged that, when Dewberry indorsed his own name to the checks, he warranted that his copayee's indorsement was genuine; that the appellant was liable on Dewberry's warranty under the doctrine of agency. Dewberry did not indorse appellant's name on the check as its agent; he indorsed his own name as payee. This argument, if sound, would deny to a principal the protection afforded by making a check jointly payable to his agent and another, an established practice in business, and would seriously curtail the broad language of the negotiable instruments statute, which provides that where there are joint payees, all must indorse.

The petition for rehearing is denied.